UNITED STATES, Appellee

v.

MELVIN A. SHULL, Private, U. S. Army, Appellant

1 USCMA 177, 2 CMR 83

·1ST LT. John D. Calamari, USA, for Appellant.

MAJ. Augustus A. Marchetti, USA, and 1ST LT. Eugene L. Grimm, USA, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

The petitioner, Shull, was tried by general court-martial at Fort Campbell, Kentucky, on May 8, 1951, and found guilty of absence without leave "with intent to shirk important service, to wit, shipment to the Far East Command," in violation of Article of War 58, 10 USC § 1530. He was sentenced to receive a bad conduct discharge, to forfeit all pay and allowances to become due after the date of the order directing execution of the sentence, and to be confined at hard labor for one year. The sentence was approved by the convening authority and affirmed by a board of review in the Office of The Judge Advocate General, United States Army. The accused requested this Court to review the conviction under the provisions of Article 67(b)(3), Uniform Code of Military Justice, 50 USC § 654. We granted his petition, limiting argument to the question of whether the evidence was sufficient to sustain a finding of intent to shirk the important service alleged.

Such facts as are material to our decision in this case are set out immediately hereafter. Petitioner was a member of Company A, 511th Airborne Infantry Regiment, stationed at Fort Campbell, Kentucky. On March 5, 1951, he volunteered for overseas duty with the Far East Command. The first sergeant forwarded his name together with others through channels to regimental headquarters, and on the same day was informed that petitioner had been selected for the requested duty. At this time the first sergeant was told that Shull's name would shortly appear on orders transferring him to the 11th Replacement Company. This notice was informally relayed to petitioner, who a day or so later applied to the commanding officer of Company A for a three-day pass. At that time he referred to the imminence of his departure from his old company, and stated that he wished the pass in order that he might visit his home to deal with a "family difficulty." After informing the accused of the likelihood of immediate orders transferring him to the Replacement Company and warning him of the possible legal consequences of overstaying his pass, the company commander granted the request and issued a pass covering the period from 6:00 a. m., March 9, to 6:00 a. m., March 12. Subsequently, the accused departed for his home in Decatur, Illinois. Thereafter the following events transpired in the sequence in which they are set out. On March 9 an official military order issued (dated March 8, 1951) transferring the accused to the 11th Airborne Replacement Company, Fort Campbell, Kentucky. On March 11 the charge of quarters of the accused's company received a telephone call from a person who identified himself as the accused during which it was stated that the latter would not be able to meet the return hour of his pass, but would rejoin his organization during the afternoon of the terminal date, that is, March 12. On March 13 or 14 a further order issued (dated March 12, 1951) transferring a quota of enlisted men from the 11th Replacement Company to the Personnel Center, Camp Stoneman, California. The accused's name did not appear on this order. On March 19 the contingent mentioned departed for Camp Stoneman. On

March 22 the accused was apprehended at his home by a Decatur, Illinois, civilian police officer.

In addition it should be reported that as a part of the government's case the investigating officer was called to testify to the contents of an oral statement made by the accused during the course of investigation of the present charge, and characterized by the trial judge advocate as "closer to a confession" [than to an admission]. The substance of this language of the accused, as repeated by the prosecution's witness, is set out below in toto:

"I cannot remember word for word, but, in substance, it amounted to this: that he did request a three-day pass of his company for the purpose of seeing his wife, with whom he was having difficulty; that he did receive a pass and went home to Decatur, Illinois; that upon the completion of his three-day pass he was without funds to return to his home station at Fort Campbell; and that he went to the Red Cross to request funds to return to his home station; that he did receive funds from the Red Cross on the 13th and, after receiving funds from the Red Cross, went to the bus station, bought a ticket and later on the 13th, the same day, boarded a bus and started for Fort Campbell. On the way to Fort Campbell the bus stopped at Evansville—and incidentally, at this point, if you don't mind my interrupting, in the original statement the accused made to me the first time he said he got off the bus at Terre Haute, Indiana, but when I had the statement typed and brought back, he read it over and said no, it was not Terre Haute, it was Evansville, and I changed that. Going back to the statement, he said when the bus got to Evansville and stopped he got off the bus, called his wife, and asked if she intended going through with the divorce. She stated she did. He then hitch-hiked back home."

On the basis of these facts the accused was found guilty of desertion by absenting himself without leave with intent to shirk important service. We are now asked to pass on the sufficiency of the evidence in this case to support the necessarily implied finding that the accused—at the inception of or during his established unauthorized absence — intended to avoid shipment to the Far East Command as alleged. In our opinion it is not sufficient for the purpose.

Of course, the burden of proving the accused in this case guilty of the offense alleged beyond a reasonable doubt was on the government. In the language of the Manual for Courts-Martial, 1949, paragraph 41c:

"As to each offense charged, the burden is on the prosecution to prove beyond a reasonable doubt by relevant evidence that the offense was committed, that the accused committed it, *that he had the requisite criminal intent at the time,* and that the accused is within the jurisdiction of the court, except to the extent that such burden is relieved by a plea of guilty." (Italics supplied)

Of course, too, a specific intent is an essential ingredient of the law violation attributed to the accused here. In this connection the Manual for Courts-Martial, 1949, has the following to say:

"In certain offenses, such as larceny, burglary *and desertion,* a specific intent is necessary. . . . In those cases the specific intent or frame of mind may be established either by independent evidence, as, for example, words proved to have been used by the offender, or by circumstantial evidence, as by inference from the act itself." (par 140a) (Italics supplied)

Under the language of the specification under which he was tried, it was, therefore, incumbent on the government in this case to establish beyond a reasonable doubt by direct or circumstantial evidence that the accused through his absence without leave intended to avoid military assignment and transportation to the Far East

Command for service in which command he had volunteered.

As we said in United States v. McCrary, (No. 4), 1 USCMA 1, 1 CMR 1, decided November 8, 1951:

"It is the cardinal rule of law that questions of fact are determined in forums of original jurisdiction or by those which are expressly granted the authority by constitution or statutes. Usually, appellate tribunals are limited to correction of errors of law. . . .

. . . . . .

"There can be no question that the Congress of the United States intended to adopt this general rule and did not intend to extend review by this court to questions of fact." (citing Uniform Code of Military Justice, Article 67(d))

It does not follow from the foregoing, however, that this Court is without authority to evaluate the testimony and other evidence in this or any other case before it for the purpose of determining its sufficiency as a matter of law. Certain it is that rules having to do with reasonable doubt, necessity for the exclusion of every reasonable hypothesis save that of guilt, and the like, exist primarily for the guidance of trial forums. Certain it is, as well, however, that their administration by such agencies is not beyond the supervision of this Court, or by any other appropriate appellate tribunal. As we have said elsewhere, to hold the converse would effectively deprive courts of review of any sort of direction and control over subordinate elements of the judicial scheme in an important area of law administration. See United States v. O'Neal, (No. 25), 1 USCMA 138, 2 CMR 44, decided February 7, 1952. Accordingly, while we are in no sense permitted to substitute our own judgment for that of the triers of fact, it is clearly allowable that we weigh the evidence for the limited purpose of testing for substance and determining the reasonableness as a matter of law of inferences drawn by the fact-finders. The following sentences used by us in United States v. O'Neal, supra, will doubtless aid in comprehending the standard we are applying to the case at bar:

"These cases [cited federal civilian cases] appear to establish fully the presence of substantial authority to the effect that if a reasonable inference other than that of guilt may be drawn from the evidence, a trial court should direct for the accused, and in a proper case an appellate court should reverse a conviction. The question now arises: the yardstick of whose judgment is to be applied in the solution of this problem? Or to put it somewhat differently, must we reverse if reasonable men cannot agree on the balance of hypotheses? Or are we required to sustain unless reasonable men would agree that a rational hypothesis other than that of guilt may be drawn from the evidence? Our answer to the inquiry's first form is that our judgment, as such, is not the standard for application, but rather our conception of the judgment of reasonable men. And our response to its second is that we must not reverse unless we believe that reasonable men would be in accord in holding that a rational hypothesis other than that of guilt may be drawn from the evidence. We regard these as manifestly the more rigorous standards, and for that very reason—and in these premises—the only proper ones."

To phrase our position in more specific and in probably stronger terms, an accused may not be convicted on the basis of mere suspicion, conjecture, and speculation. United States v. O'Neal, supra. And where all the substantial evidence, within an appellate court's conception of the fair operation of a reasonable mind, is as consistent with innocence as with guilt, it is its duty to reverse a judgment of conviction. Towbin v. United States, 93 F2d 861 (CA10th Cir). In 16 CJ 763–764 the rule is stated:

180

"In order to sustain a conviction on circumstantial evidence, all the circumstances proved must be consistent with each other, consistent with the hypothesis that accused is guilty, and at the same time inconsistent with the hypothesis that he is innocent, and with every other rational hypothesis except that of guilt."

Approaching the case at bar, it should be observed that others who have dealt with its problem have sought elaborately and at length to delimit important from what may be characterized as ordinary service, and our attention has been directed to a number of cases and other authorities concerned principally with whether this or that variety of duty is to be regarded as "important" within the meaning of the Articles of War. This, we think, is quite beside the mark. We are not concerned here with whether artillery practice in Hawaii, field exercises in Oklahoma, transfer to a replacement pool or even movement to a staging area constitute important service. The specification here before us treats of a particular sort of service, and one which under any permissible interpretation of the term is important. Certainly—and this is amply supported by the military cases—foreign service during time of war or under emergency conditions and in or near a combat area is important service, and this is precisely what our specification alleges the accused intended to shirk. There is nothing whatever wrong or questionable in the charge sheet here: our problem wholly goes to the proof. Does the circumstantial evidence in this case support as a matter of law a finding that Shull intended to shirk transfer to the Far East Command? As we have already indicated, we think it does not.

In our view the actual physical, temporal, or administrative proximity of the accused to the service in question is not important in this type of case in any ultimate sense—that is as

a matter of law. These elements only function as items of circumstantial evidence raising inferences of intent of varying degrees of compulsion. It is conceivable, at least, that an absence without leave from a port of embarkation might not have been effected with a subjective intent to avoid overseas duty. Likewise it is logically possible, we believe, for a military person to absent himself unauthorizedly with such an intent on the very first day of his training period—far removed in time, space, and competent orders from any threat of movement to a combat theater. What we have involved in these cases is simply a matter of proof—and that is exactly what we are faced with in the present case.

It is apparent from what has been said that we do not regard "shipment to the Far East Command" as having its measurable origin in the order transferring the accused to the 11th Replacement Company. Certainly this action placed him nearer service within that Command than he had been before; this cannot be disputed. But so did his own action in volunteering for such duty, his earlier assignment to Fort Campbell, and, indeed, his very act of military enlistment or induction. Considered in the light of usual practices, a number of distinct steps were actually contemplated in the instant case as parts of the complex procedure calculated to remove the accused from Company A at Fort Campbell and to place him aboard a transport bound for the Far East. The first of these was the transfer to the Airborne organization's Replacement Company at Campbell; the second, a reassignment to Camp Stoneman, California, the staging area; the third, movement orders to a port of embarkation, probably San Francisco; and the fourth and final one, shipment to the Far East Command. We are sure that there must be a clearer channel than this to justify an interpretation of the Replacement Company transfer order as shipment to the Pacific. In this lane there are just too many possible turnings— simply too many ells and even tees in

this leisurely and perhaps pervious pipeline.

It seems to us that we have demonstrated that the question of whether service in the 11th Replacement Company, as such, is important service is not before us, in that it is not the service which the specification alleges the accused intended to shirk. In addition we have indicated that in our opinion the important service actually alleged therein—that is, shipment to the Far East Command—cannot properly be regarded as having begun with the Replacement Company assignment order at Fort Campbell. It remains to inquire into the question of whether the unauthorized absence of the accused, accompanied by knowledge that an order reassigning him to the Replacement Company would probably issue during the period he was away from his station, constitutes the requisite substantial evidence of an intent to avoid shipment to an overseas theater necessary to support the findings of guilty. We do not think that it does. On the evidence there is no serious doubt that at the time Shull overstayed his pass he knew, or had ample reason to believe, that he would shortly be placed on orders transferring him to the Airborne organization's replacement pool. There is also no doubt in our minds that at the time in question he also knew, or had ample reason to believe, that he was ultimately destined for the Far East Command, and that at some uncertain future date he would doubtless be transferred from the pool at Campbell to some other organization from which in turn still other orders would move him ever nearer to shipment. He must have known of these latter probabilities, for he had volunteered for this duty, and he had been notified, however informally, that he had been selected for the assignment. Beyond these matters, however, he knew nothing. In the very nature of things he could have known nothing at the time of his departure on pass—for, according to the unanimous testimony of his immediate superiors, they themselves had no knowledge of details at that time and thus could have imparted no information to him. Literally no one says he spoke to the accused of when or how he would leave the replacement pool or of where he would go from there, and there is no showing that he had reason to know that by overstaying his pass he would be absent at the time of accomplishment of any step beyond his transfer to the 11th Replacement Company. It is certainly true that the petitioner's commanding officer testified that earmarked contingents ordinarily cleared the pool within "ten days, two weeks, or so" after assignment thereto. However, the record contains no barest suggestion that even this vague and meager intelligence was communicated to Shull by any source. Beyond the transfer order to the 11th there is little to support the findings save suspicion, conjecture, and speculation. Certainly there is not that imminence of the important service alleged demanded by the soundest theory and the best considered military cases. Accordingly we hold that the inferences made by the fact-finders in the case at bar were not legally permissible ones.

In conclusion it should be said that we are not concerned directly or immediately at all with the accused's alleged and probable domestic difficulties as such. Whether his intent in overstaying his pass on March 12 was to deal with them, or whether he had some other motive, is a question of fact, and if a court-martial on the basis of legally sufficient evidence had reached the conclusion that he had some other intent—say one to shirk important service, for example—we could not properly disturb such a finding. What we are attempting to suggest at this point is merely that we do not mean to enunciate a rule necessarily requiring in such a situation that a court-martial conclude that an accused's primary motive must have been to avoid the important service or the hazardous duty alleged. It is enough, we hold, that in a case of this nature a court-martial determine on the basis of substantial evidence that the duty was imminent, and that

182

as a consequence of his unauthorized absence the accused in fact avoided it or had reasonable cause to know that he would do so. Since one in the position of such an accused will be deemed to have intended the natural and probable consequences of his actions, we cannot in propriety complain if a court-martial regards primacy among motives as unimportant.

Applying the principles and discussion developed above to the specific question before us in this case, we are firmly of the opinion that the finding of intent to shirk the important service alleged must be set aside as based on insufficient evidence. This action is predicated on the position that the evidence before the court-martial did not permit a determination of the possession of such an intent on the part of the accused beyond a reasonable doubt and within the fair operation of reasonable minds. However, as found by the trial court on substantial evidence, the accused is guilty of an unauthorized absence of twelve days. Accordingly, the case is remanded to The Judge Advocate General, United States Army, for such corrective action as may be necessary.

Chief Judge QUINN concurs.

GEORGE W. LATIMER, Judge (dissenting):

I dissent.

The Court's opinion applies the concepts announced in United States v. O'Neal, (No. 25), 1 USCMA 138, 2 CMR 44, decided February 7, 1952, and my dissent in that case expresses, in part, my reasons for not concurring in this decision. I, therefore, do not argue the legal principles except the one which may be involved in a consideration of the evidence in this case to support the finding of guilty.

The Court overrules the contention of petitioner that the service involved is not important, and poses the principal question in the following language: "Does the circumstantial evidence in this case support, as a matter of law, the finding that Shull intended to shirk transfer to the Far East Command?"

To answer the question the Court relates only those facts which are considered material to the majority decision. I take the view that all facts favorable to the finding should be considered, and from those it should be determined whether there is sufficient evidence from which a court-martial could find the accused guilty beyond a reasonable doubt. In the interest of brevity I will not relate the differences, except as they are pointed up in my argument; and, because the absence without leave is clearly established, I need only argue the question of intent.

I believe it well to consider that, without an admission by the petitioner, the question of his intent must be inferred from facts and circumstances which tend to throw light on his mental attitude. The general rule concerning this element of a crime is stated in Estep v. United States, 140 F2d 40, at page 45:

"Of course guilty knowledge or criminal intent is usually a factual question, peculiarly within the province of the jury, and is seldom provable by direct evidence, but must be inferred from facts and circumstances which reasonably tend to manifest a mental attitude. Gates v. United States, 10 Cir, 122 F2d 571, 575; Aiken v. United States, 4 Cir, 108 F2d 182; Shell v. State, 184 Ark 248, 42 SW2d 19."

In reaching the conclusion I do, I have in mind that the inferences from the facts and circumstances were determined adversely to petitioner by members of the court-martial and I mentioned those which they might have drawn to show they are within the bounds of reason.

The petitioner, who apparently was not doing too well in his company, requested that he be given a three-day pass. This request was refused. Shortly thereafter, a call was made on Headquarters, Fort Campbell, to furnish replacements for the Far East Command. The call was broken down

and sent out to the various camp units and the first sergeant of Company A, 511th Airborne Infantry Regiment (petitioner's company) was selected to obtain the volunteers from that unit. The petitioner volunteered and his name was placed on the list which was forwarded to higher headquarters on the 6th day of March, 1951. He was selected as one of the members to go on shipment, and this information was conveyed to the first sergeant who in turn relayed it to the petitioner. It was then too late for him to withdraw from the assignment. Apparently, the sole and only reason for transferring petitioner to the Replacement Company at that time was to place him in the channel used to transport personnel overseas. He, therefore, knew that he had been specifically selected and was being processed for a combat area. The exact date of departure from Fort Campbell or any intervening station was not known, but once the journey was started there was little likelihood of there being any permanent interruption. The petitioner, either on the day of notification or the next day, but certainly after he was aware of his acceptance for the shipment, again contacted the company commander to obtain the three-day pass. He informed the commander that he was going to the Far East Command, and would like to go home over the week-end. The whole tenor of the conversation concerned the importance of getting home and back before the shipment left. The commander had some reservations about issuing the pass because of possible interference with the movement of the shipment. To clear up any doubt he required a statement from petitioner that he had cleared with the replacement company commander, who would be concerned, since the last day of authorized absence was after the effective date of the morning report change. The company commander also requested assurance from the petitioner to the effect that he had ascertained that there would not be any shipment to the Far East Command before his time of return.

184

The petitioner had completed some, if not all, of the processing required prior to shipment and there is nothing suggested which would interfere with his transfer to the overseas command. When the company commander concluded to grant the pass he took occasion to read to the petitioner Article of War 28 and warn him of the seriousness of the offense of being absent when the shipment departed. It appears that other similar shipments had departed from Fort Campbell, and, according to the company commander, it was shown that shipments to the Far East cleared the post in not more than from ten days to two weeks after the call. In this instance the call was made on the 5th or 6th of the month, the order transferring the petitioner was dated the 8th, the shipment order the 12th, and the men who were on the shipment order left for Camp Stoneman on the 19th. From this it would appear that the shipment was well within the limits of the time pattern established. The petitioner had been stationed at Fort Campbell for some little time and he would have had a reasonable opportunity to know the time involved between selection and departure. In addition, it seems almost inconceivable that a person volunteering for a specific overseas assignment would be totally uninformed as to the probable time of departure. He might not know the exact day or hour, but he would know the maximum period he could safely rely on. That item of information is usually one of the first to be considered and was considered by the petitioner when he made his request for a pass. In this instance, if an immediate movement had not been contemplated by the petitioner his reasons for any haste to go on a short pass would have been uncalled for. Some fifteen days expired between the date of his starting on pass and the date he was apprehended by civilian police, and when the latter occurred he was not making any attempt to return to his station; and this lack of effort, in spite of an acknowledgment by him to the apprehending of-

ficer that he knew he was on shipment to the Far East.

When summed up, I find the company commander, with extraordinary care, impressing on petitioner the importance of the service and the necessity of returning at the end of the pass period. He was concerned about the fact that the shipment might leave before the pass expired and to make certain such would not happen had inquiries made. This information was obtained by or communicated to petitioner and should have put him on notice that shipment could be expected at any time thereafter. Certainly, it can be said that everyone connected with the transfer, including petitioner, felt the shipment was imminent. He had knowingly placed himself in the channel for overseas shipment and no reason is apparent which would lead him to believe that thereafter movement would not be reasonably rapid and certain. Processing commenced immediately, was partially completed, and every indication pointed to an early movement. In spite of this, petitioner left with a warning ringing in his ears and remained away until he was apprehended on a date too late to accompany the shipment to Camp Stoneman. In short, and as I view the record, the evidence is sufficient, in both quality and quantity, to permit the court to find that petitioner knew he was selected for overseas duty; that the time for leaving Fort Campbell was fixed with sufficient certainty that he knew, or should have known, that any absence over and beyond the leave period probably would result in his missing the shipment; that an absence of from ten days to two weeks would, with reasonable certainty, bring about that result; and that the absence, under the circumstances, was of such length and duration that petitioner intended to miss his shipment to the Far East.

Because of my belief that the court-martial could infer the necessary intent from the facts in the record, it becomes necessary that I mention a theory advanced by the petitioner. Conceding that he volunteered for foreign duty and that, as contended by him, it would appear unreasonable for him immediately thereafter to absent himself with intent to avoid that duty, there were subsequent happenings claimed by him which might reasonably cause a change in his mental attitude. It can be assumed from his acts that he believed it important that he be back at camp prior to the expiration of his pass period. According to stipulated testimony, a call was made to a sergeant in charge of quarters and notification given to him that someone claiming to be the petitioner would not be able to report at reveille but would report in by noon of the 12th. Thereafter, according to petitioner's pretrial statement, he started for Fort Campbell and had reached Evansville, Indiana, a little over 100 miles from his station. He made a telephone call from there and upon learning that his wife was going to go through with her action for divorce he reversed his journey, returned home, and thereafter made no further attempt to contact his unit or to proceed to Fort Campbell. A change in her plans might have induced him to change his. From the time of his return to his home until his apprehension a nine-day period had passed. It could reasonably be concluded by the court that his personal problems far out-weighed his duty to the service and that he would remain home until they were settled, regardless of the consequences. The law does not require that the intent to shirk important service be formed at the inception of the absence, it can be formed at any time while in that status.

I would affirm the holding of the board of review.