UNITED STATES, Appellant

v.

Yolanda M. HUET–VAUGHN, Captain
U.S. Army, Appellee.

No. 94–5005.
CMR No. 9101873.

U.S. Court of Appeals for
the Armed Forces.

Argued April 4, 1995.

Decided Sept. 28, 1995.

Certiorari Denied Feb. 20, 1996.

See 116 S.Ct. 922.

For the Accused: *Hillary Richard* (argued); *Caroline Rule* (on brief).

For the United States: *Colonel John M. Smith* (argued); *Colonel Dayton M. Cramer, Lieutenant Colonel James L. Pohl, Captain Gregory T. Baldwin* (on brief); *Major Lyle D. Jentzer.*

## Opinion of the Court

GIERKE, Judge:

1. A general court-martial composed of officer members convicted Captain (CPT) Huet–Vaughn, contrary to her pleas, of desertion with intent to avoid hazardous duty and shirk important service, in violation of Article 85, Uniform Code of Military Justice, 10 USC § 885. The court-martial sentenced her to dismissal from the service, confinement for 30 months, and total forfeitures. The convening authority reduced the confinement to 15 months. The Deputy Assistant Secretary of the Army for Department of the Army Review Boards and Equal Employment Opportunity Compliance and Complaints Review remitted 7 months of confinement and ordered Captain Huet–Vaughn released from confinement after she had been confined for 240 days.

*See 41 MJ 213, 229 n. * (1994).

2. The Court of Military Review* set aside the findings of guilty and the sentence on the ground that the military judge had improperly restricted CPT Huet–Vaughn from presenting evidence of motive. 39 MJ 545 (1994). The Judge Advocate General of the Army then certified the following issue for our review:

> WHETHER THE MILITARY JUDGE'S GRANTING OF THE GOVERNMENT'S MOTION *IN LIMINE*, RESTRICTING [CPT HUET–VAUGHN] FROM TESTIFYING AND PRESENTING OTHER EVIDENCE OF MOTIVE TO CONTEST THE ELEMENT OF SPECIFIC INTENT, WAS PREJUDICIAL ERROR.

We answer the certified question in the negative.

### Factual Background

3. The prosecution filed two motions *in limine*. The first asked the military judge

> to exclude any documentary or testimonial evidence of any sort during the case on the merits concerning the accused's alleged status as a conscientious objector; the dictates of her conscience, religion, or personal philosophy; her patterns of belief concerning the Persian Gulf conflict and war generally; and her world views....

4. The prosecution argued that such evidence was irrelevant and that, even if relevant, it "would confuse the issues, mislead the members, or be a waste of time."

5. The second motion *in limine* asked the military judge

> to exclude any documentary or testimonial evidence of any sort during the case on the merits, or during sentencing should the case reach that stage, concerning the legality of the conflict in the Persian Gulf or the legality of Presidential authority to order members of the armed forces to Southwest Asia....

6. The Government argued that the court-martial "is not the appropriate forum to litigate the legality of the conflict in the Persian Gulf or the legality of Presidential authority[.]" The Government characterized

such issues as "political questions outside the realm of judicial scrutiny." Alternatively, the Government argued that "the legality of the Persian Gulf conflict is irrelevant as a defense to the charge of desertion."

7. After extensive argument and offers of proof, the military judge opined as follows:

If the reason for going AWOL [absent without leave] or quitting the unit, as is used in this specification, was to avoid this duty, then it makes no difference what her reason for intending to avoid this duty was, except in extenuation and mitigation.

8. After further argument, the military judge ruled:

Well, it's an interlocutory question, it'll be raised before me. But at this point the motion is denied. I'll allow Captain Huet–Vaughn, subject to objection, to tell what her—what her intentions were, if you feel that that's appropriate at any given time. But I'm saying that—I guess what I'm doing here—and what a motion *in limine* is is basically a declaratory as to what—how my rulings will run with regard to how far I'll let her testify as to what her views of the world were. Okay. All of that in extenuation and mitigation, obviously, is—is open....

9. The discussion continued, and defense counsel asserted that CPT Huet–Vaughn's "intent was not to avoid hazardous duty or important service, but her intent was to expose what she felt were impending war crimes in the Persian Gulf and to expose that to the American people, to the Congress, to the United Nations, talk shows, et cetera, et cetera. That was her intent; that was the reason why this lady actually went AWOL."

10. During *voir dire* of the court members, defense counsel asked a potential member what his opinion was about conscientious objectors. The military judge interrupted and advised the members that "as a matter of law, one who consciously and intentionally quits one's unit to avoid hazardous duty and/or important duty because of one's conscious—conscience, religion, or personal philosophies, that is not a defense." He further instructed that "a person who consciously and intentionally quits one's unit to avoid

hazardous duty and/or important service because of one's belief that she may be asked to become a principal in an illegal act, *i.e.*, a war crime, is speculative and is not a defense."

11. Defense counsel also asked a member whether he understood that other officers and enlisted soldiers could differ with him on a matter of conscience. The military judge interrupted, instructed the member not to answer, and stated, "I've already instructed them that matters as to conscience are not to be considered on the merits."

12. During opening statements, defense counsel told the members:

Her specific intent on leaving was not to avoid hazardous duty.... This was a lady of conscience; that was not her specific intent. Now, just what her specific intent was, I've been restricted from making statements as to what that specific intent was. I cannot tell you. But, in any event, she will testify and she will be asked to explain what her specific intent was. And if that objection is sustained, if there is an objection on that question and if it is sustained, you will not hear from her what her specific intent was. In other words, we might not well be permitted to introduce our evidence from our side as to the circumstances of what her specific intent was.

13. After opening statements, the military judge instructed the members as follows, over defense objection:

I'll comment briefly on the opening statement, because the references kind of leave you dangling as to what it is that I've ruled and—and what it is that you will or will not be able to consider, depending on what the objections are by counsel. The element in question that's been referred to by Mr. West on various occasions is that the accused did so—that is, to—the first element is that she quit her unit. The second element is the one that's—that's in—that he's been talking about all along. And the element is that the accused did so with intent to avoid hazardous duty and/or to shirk important service; namely, deployment to Southwest Asia in support of Operation Desert Shield. At issue is whether the accused consciously, intentionally quit

her unit so she would not have to perform these duties. To consciously, intentionally quit one's unit to avoid hazardous duty and/or important service because of one's conscious—excuse me—conscience, religion, or personal philosophies is not a defense. It may be a motive, but it is not a defense. . . .

14. CPT Huet–Vaughn testified in her own defense. She described her background, her family, and her upbringing, as well as her political activism beginning with antiwar demonstrations in high school. She described her medical education and experience, and her work with organizations devoted to bringing health care to inner-city areas and rural areas. While in medical school, she joined the Tennessee National Guard as a second lieutenant in the Medical Service Corps. She regarded it as an opportunity to provide community service. She also participated in anti-apartheid activities and women's issues as a civilian.

15. After graduating from medical school, she began a residency in social medicine and family practice in the Bronx, New York City. She transferred to a National Guard unit in the Bronx. She became interested in the health effects of nuclear weapons and worked with a national organization known as Physicians for Social Responsibility (PSR). After naming two prominent members of PSR, defense counsel asked CPT Huet–Vaughn, "I believe you called both those witnesses in your case, is that right?" Trial counsel objected to the reference to witnesses who had been ruled irrelevant. The military judge sustained the objection and admonished defense counsel not to refer to proceedings conducted outside the hearing of the members.

16. CPT Huet–Vaughn testified that when she moved back to Kansas City, Missouri, she transferred to the 325th General Hospital, an Army Reserve unit. After completing her residency, she resigned her reserve commission in August 1982 and entered the Public Health Service as a commissioned officer. In November 1983 she resigned her Public Health Service commission and entered the "private practice option in the Public Health Service," working as a private family doctor in underprivileged areas.

17. In June of 1990, CPT Huet–Vaughn again joined the Army Reserve. When she rejoined the Army Reserve, she was aware of United States activity in Panama and Grenada, and the bombing of Tripoli. She testified that she thought the invasion of Panama was illegal and that the bombing of Khadafy's household in Tripoli was "a violation of international law."

18. Defense counsel asked CPT Huet–Vaughn why she rejoined the Army Reserve. She responded that she was motivated by her desire to pay back the 7–year commitment she had made in medical school, by her desire for public service, and to gain credibility in her political activism.

19. As hostilities escalated in the Persian Gulf, CPT Huet–Vaughn actively spoke out, along with several other PSR members who also were members of her reserve unit. She testified that she and her PSR colleagues "were very concerned . . . [b]ecause in the early fall we deployed more than 350 nuclear weapons to the Gulf. And those are weapons of mass destruction. Those are weapons outlawed by international convention." Trial counsel objected, and the military judge ruled that he would "let her comment briefly." She continued testifying that she was concerned because "[e]ven if they weren't used, something could happen and it would be a tragedy and—and a disaster if they were used."

20. On December 23, 1990, CPT Huet–Vaughn was ordered to active duty. Although she complied with her orders, she testified:

I was having reservations at this time, very strong reservations, about providing any support to Operation Desert Shield, whether it be in the Persian Gulf, whether it be in Europe, or whether it be stateside.

21. Defense counsel then asked CPT Huet–Vaughn to tell the court-martial "how you came to that—that reservation and when, if that reservation was a mounting thing?" Trial counsel objected, and the military judge told defense counsel:

Well, if what you're trying to get from her is what her—her moral approach was to this, her religious approach, and her personal philosophies with regard to what was going on, I've already explained to the court and—and to you that those are in no way a defense to this, and therefore they're not relevant.

Defense counsel explained that he was offering CPT Huet–Vaughn's testimony "as a chronology of events to show how this lady became concerned to the point where she wouldn't go." The military judge responded, "Just ask her if she began to have moral reservations." Defense counsel complied, and CPT Huet–Vaughn testified:

Well, I began to be—I guess, moral reservations, as—as you put it, and also reservations regarding medical—my role as a physician and my—and the ethics of what I was doing as a physician. I learned a great deal in that last month from a number of—of other, what I consider very learned, groups, like the International Physicians for the Prevention of Nuclear War, like Physicians for Social Responsibility, about the projected civilian casualties that—

Trial counsel's objection at that point was sustained. CPT Huet–Vaughn continued, "I learned a great deal about an environmental disaster that was—." Trial counsel's objection again was sustained. When the military judge observed that CPT Huet–Vaughn was talking about things that "affected her personal philosophy," defense counsel responded that they "affected her decisions," and CPT Huet–Vaughn interjected, "And which affected my intent."

22. Permitted by the military judge to continue, CPT Huet–Vaughn testified:

And I put the data that I had gathered together, still doubting, I guess—still hoping, I guess, would be the word, or not believing that the information I had gathered that had—that if—if the administration knew the information that I had gathered, which I was hoping they did, that they would not be willing to—to gamble all of the catastrophic consequences that I saw occurring if—if we proceeded to war.

When then things mounted and—basically I learned that, while I was at Fort Leonard Wood, that we had mobilized the civilian blood supply, I—

Trial counsel again objected. The military judge advised defense counsel that he could ask a general question so that she could describe "some moral conclusions, some philosophical conclusions, some ethical conclusions" and that she acted on those conclusions. CPT Huet–Vaughn, still on the witness stand, asked, "[C]an I talk about medical ethics?" The military judge responded, "[N]ot in specifics." She continued:

Okay. Well, then, I'll be—I came—with the data that I gathered with the concerns that I had that were ethical, moral, also based on—on my—the oath that I had taken as a physician and also the oath that I had taken as—as a military person, I felt that something more was required of me than to just proceed without—without attempting to—without attempt to—to expose what I saw at that point as—as a move to a catastrophic consequence.

Trial counsel's objection at that point was overruled. CPT Huet–Vaughn continued:

You can—there's sins of omission and sins of commission, so to speak. You can do something that's wrong, or you can refuse to do something that's right. And what I saw my choice at that point was that if I—if I went along with—with the orders that I was given, I would in fact be choosing to not do something that—to committing a sin of omission, so to speak. Having all the data that I gathered, having the perspective that I had, and ignoring it, would have been immoral and would have been something that I could not do.

The prosecution again objected, but the military judge ruled, "I'm going to let her proceed." She continued:

And so I, at that point, made a decision that I would have to withdraw my consent from what—from what was happening and—and so—so I did in an effort to—to try to—to educate and to hopefully mobilize again the community to do something about this in Washington and at the United Nations, so that this wouldn't happen.

23. CPT Huet-Vaughn testified that she "consider[ed] the Nuremberg Principles from my course at Fort Sam Houston" in arriving at her decision. She also consulted with several religious, political, and medical authorities. After she described her various consultations, defense counsel asked her, "When did you make up your mind about not going to the Persian Gulf?" She responded, "I made up my mind not to support Desert Shield—," but she was interrupted by the prosecutor's objection. The military judge allowed her to continue, and she responded:

On the evening of—let's see, it must have been December—it was Friday. We—we—let's see, December the 20—December the 28th, I think, was a Friday, and I made my decision at that time that I would—would not support Desert Shield, either in the Persian Gulf, in the States, or in—in—anywhere else.

24. Defense counsel then questioned CPT Huet-Vaughn about her intent:

Q. Now I want to ask you this question very carefully. What was your intent at the time you went AWOL?

A. My intent at that time was—was to expose the nature of what I knew—

TC: Objection, your honor.

MJ: Restate your question.

Q. What was your intent at the time you went AWOL, absent without authority, from Fort Riley, Kansas, on January 30, 1991[sic]?

TC: That's the same question, your honor.

Q. December the—

MJ: That's the exact same question. Let's ask a question that's relative to this offense.

IC (MR. WEST): Yes, sir, it is. Her intent is very relevant.

MJ: With regard to these duties, what—what was her intent?

IC (MR. WEST): What?

MJ: With regard to these duties, what was her intention in leaving?

IC (MR. WEST): I'm not going to ask that question.

25. The military judge and defense counsel then discussed the difference between "intent" and "purpose." Defense counsel then resumed his questioning as follows:

Q. Was your intent at the time you went AWOL for the purpose of avoiding hazardous duty or important service in the Persian Gulf?

A. No, it was not.

Q. What was your intent?

A. My intent at—at the time that I left was to withdraw my consent from what I saw as an illegal and—and totally unnecessary catastrophe.

TC: Objection, your honor.

MJ: Sustained. Sustained.

IC (MR. WEST): All right. I—I feel I must make an offer of proof as to this element, and I would prefer if I may do so in closed court without the jury's presence.

* * *

[Court members were excused.]

* * *

Our offer—offer of proof at this time is that if this witness were permitted to answer this question, she would state that her intent at the time she went AWOL from Fort Riley, Kansas, on the night, I think, of December the 30th, 1990—'91—or '90, was to withdraw her support from Operation Desert Shield and to demonstrate by her—by her absence and by her unauthorized absence was to demonstrate and to expose what she felt were the illegal war plans of the United States of America to invade Kuwait [sic] and to destroy its civilian infrastructure, i.e., its economic civilian infrastructure that supported civilian life in Iraq, and that it was the intention of the United States government to destroy the power plants, the electric power plants, the sewage treatment plants, the water purification plants of Iraq, for the purpose of destroying electricity and destroying fresh water supplies, so the civilian economy would be wracked with ruin and damnation, and so thousands of civilians would die as a result thereof.

MJ: I'm going to stop you there, Mr. West. The—the record is resplendent

with—with what you felt that she was going to do. We already have that on the record, and I've already ruled on this, and I think we're just taking up valuable time at this point. I'm not going to allow that. I've explained to you my view of the law on this point several times before. The intent that's referred to in that element is a willfulness; that is to say, that she consciously and willfully made a decision that she was not going to take part in that activity. What you're talking about is—is—is her rationale for making that, and that's not a defense, and we're not going into it on the record, sir.

26. After the court members returned to the courtroom, defense counsel continued:

Q. I think it's fair to state that at this time, the time that you've stated, around November the—or around December the 30th, you have gradually and slowly reached a determination, but you finally have a crystallization of view on December 30th that you cannot participate or support Desert Shield?

A. Actually, that was December the 28th.

Q. The 28th, 29th, and then 30th is when you left?

A. Correct.

Q. And you had a specific intent at the time you left to do certain things, right?

A. Right, but I—as—

Q. Don't tell us what they were.

A. No, I'm not, but as of December the 29th in the morning, I had already made my intent very clear to command here at Fort Leonard Wood, I thought.

* * *

Q. This is the order which is addressed to you and which people said was handed to you. There's no doubt in your mind you received that order?

A. No. I got that late in the evening or early night of the 29th.

* * *

Q. Okay, and even with your limited military background, really limited, you knew what it meant?

A. Well, I knew that it meant that there was a strong possibility that I'd deploy to Southwest Asia.

Q. All right, and that's what you intended to avoid by going AWOL, isn't that right?

A. Well, yes and no. I mean, I had made the decision already before I even received those orders that I was not going to support Desert Shield or Desert Storm, and I made that very clear to Colonel Abshier the morning of the 28th.

Q. Okay, so when you got your orders, you had already resolved that you weren't going?

A. I had already resolved that I was not going to support this policy in any way.

Q. All right, and now you took off, right?

A. Yes, I did.

Q. You left?

A. I left.

Q. And you went to various places while you were gone, various cities, is that correct?

A. That's correct.

CPT Huet–Vaughn then described her visits to the United Nations, the United States Congress, radio and television talk shows, community groups, and an anti-war rally. On February 2, she terminated her absence by surrendering.

27. On cross-examination CPT Huet–Vaughn testified as follows:

Q. And when you left on the 30th, you left so that you would not have to deploy to Southwest Asia, didn't you?

A. No, I did not. I left so that I could—so that I could educate and expose the nature of what I saw occurring, and so that I could withdraw my consent from—from the policy that was occurring at that time.

Q. Isn't withdrawing consent simply a convenient way of saying that you didn't want to deploy?

* * *

[Defense objection overruled.]

A. Withdrawing consent means that I did not want to support Desert Shield, whether it was in Saudi Arabia, Germany, or the

United States, or anywhere else. So, I mean, included within that set of refusal to support would be Saudi Arabia, yes.

\* \* \*

Q. All right. So whether the Army was ordering you to go to Saudi Arabia or anywhere else, you weren't going to obey that order?

A. Whether the Army was ordering me to Saudi or whether they were going to tell me to stay put at Fort Riley to support Desert Shield or whether they were going to send me to Germany, I could not, in good conscience, support that policy, no.

28. On redirect, CPT Huet–Vaughn testified as follows:

Q. Why did you choose not to?

A. I chose to—to perform what I considered a more important service to—to the American public and to try to educate it regarding the information that I had gathered and the catastrophic nature of what was happening?

Q. Was that your intent at the time you absented yourself?

A. Yes, that was my intent. My intent was to do what I could to prevent the war from starting.

29. After CPT Huet–Vaughn testified, the defense presented numerous witnesses who testified that she was a dedicated physician, that she was sincere and caring, and that her reputation for truthfulness was impeccable.

30. The military judge refused to permit any evidence regarding the legality of the war. During cross-examination of a prosecution witness, a medical officer, defense counsel asked the effect of "destruction of Iraqi water companies, water purification plants, sewage treatment plants, and electrical plants." The military judge sustained a prosecution objection based on lack of relevance. The defense proffered two studies of medical conditions in Iraq (Def Exhibits F and G), but the military judge refused to admit them on the ground that "we're not going to litigate the morality or the legality of the war in Iraq."

31. The military judge's instructions on findings included the following:

> The elements of the offense are: That, at Fort Riley, Kansas, on or about the 31st of December 1990, the accused quit her unit, to wit: the 410th Evacuation Hospital; that the accused did so with intent to avoid hazardous duty and/or to shirk important service, namely, deployment to Southwest Asia in support of Operation Desert Shield; that the duty and service to be performed was hazardous and/or important; that the accused knew that she would be required for such duty and/or service; and finally, that the accused remained so absent until on or about 2 February 1991. To consciously, intentionally quit one's unit to avoid hazardous duty and/or important service because of one's conscience, religion, personal philosophies, ethical or professional considerations, is not a defense. Any belief by the accused that what she might have been required to do could have been in violation of international law is not a defense. . . .

The military judge denied a defense request to instruct the members that "[i]t is a defense in this case that the accused did not intend to avoid hazardous duty or shirk important service and instead had a different intent."

32. The court-martial found CPT Huet–Vaughn guilty as charged.

### Discussion

33. Appellate defense counsel for CPT Huet–Vaughn contend that the military judge erred by preventing her from presenting evidence showing her lack of specific intent to avoid hazardous duty or shirk important service. Government appellate counsel argue that evidence of CPT Huet–Vaughn's motives and her views about the unlawfulness of her deployment orders were not relevant because they did not constitute a defense.

34. To decide this case, we must analyze what the military judge said he would exclude, what he actually excluded and admitted, and how he submitted the evidence to the members during his instructions on find-

ings. CPT Huet–Vaughn did not contest the fact that she intentionally quit her unit with knowledge that it was about to deploy to the Persian Gulf. The evidentiary contest arose from her desire to introduce evidence of her motives and reasons for refusing to support Operation Desert Shield. She tendered several reasons: that war crimes would be committed, that the war would be an environmental catastrophe, and that support of the war would be morally and ethically wrong. The defense conceded at trial that service in the Persian Gulf was hazardous duty and important service. The sole factual issue was CPT Huet–Vaughn's intent when she went AWOL.

35. The military judge excluded evidence regarding the "morality or the legality of the war in Iraq," but he permitted more evidence than contemplated by the Government's motions *in limine*. Considerable evidence was admitted regarding CPT Huet–Vaughn's moral, ethical, philosophical, and legal objections to the Persian Gulf war. He permitted CPT Huet–Vaughn to present evidence of her concerns about deploying "weapons of mass destruction" and its possible "catastrophic consequence," and her belief that obeying the deployment orders "would have been immoral."

36. She was permitted to testify that it was not her intent to avoid hazardous duty or shirk important service. On cross-examination she testified that she left her unit to "educate and expose the nature of what" was happening. On redirect, she testified that she "chose to—to perform what I considered a more important service to—to the American public and to try to educate it regarding the information that I had gathered and the catastrophic nature of what was happening." Finally, she was allowed to testify that her "intent was to do what I could to prevent the war from starting."

37. Mil.R.Evid. 402, Manual for Courts–Martial, United States, 1984, provides that "[e]vidence which is not relevant is not admissible." Mil.R.Evid. 401 defines "relevant" as "having any tendency to make the existence of any fact that is of consequence to the determination of the action more proba-

ble or less probable than it would be without the evidence."

38. We have stated: "The military judge has the initial responsibility to determine whether evidence is relevant within the meaning of Mil.R.Evid. 401. We will not overturn his decision on these matters unless it is a clear abuse of discretion." *United States v. Orsburn*, 31 MJ 182, 187 (1990), *cert. denied*, 498 U.S. 1120, 111 S.Ct. 1074, 112 L.Ed.2d 1179 (1991). Furthermore, even if the evidence is relevant, the judge has great discretion in the exclusion of relevant evidence on grounds of "prejudice, confusion," or "waste of time." Mil.R.Evid. 403.

39. The issue at trial was whether CPT Huet–Vaughn left her unit "with intent to avoid hazardous duty or to shirk important service." Art. 85(a)(2), UCMJ, 10 USC § 885(a)(2). Thus, to be relevant, the proffered evidence must have tended to make her "intent to avoid hazardous duty or to shirk important service" more or less probable. If it did not tend to negate the required specific intent, it was not relevant to the defense case.

40. There are circumstances where evidence of motive or purpose is relevant circumstantial evidence of intent. *See generally* W. LaFave and A. Scott, 1 *Substantive Criminal Law* § 3.6 at 318–23 (1986). This, however, is not such a case. We hold that the military judge did not err in ruling that CPT Huet–Vaughn's motives were irrelevant to the question whether she quit her unit with intent to avoid hazardous duty or shirk important service.

41. The relationship between intent and motive is explained by Professors LaFave and Scott as follows:

A person often acts with two or more intentions. These intentions may consist of an immediate intention (intent) and an ulterior one (motive), as where the actor takes another's money intending to steal it and intending then to use it to buy food for his needy family.... It may be said that, so long as the defendant has the intention required by the definition of the crime, it is immaterial that he may also have had some other intention.

LaFave and Scott, *supra*, § 3.5(d) at 313 (footnote omitted). The "ultimate end sought ... is more properly labeled a 'motive.'" *United States v. Kabat*, 797 F.2d 580, 587 (8th Cir.1986), *cert. denied*, 481 U.S. 1030, 107 S.Ct. 1958, 95 L.Ed.2d 530 (1987).

■ 42. To the extent that CPT Huet–Vaughn quit her unit as a gesture of protest, her motive for protesting was irrelevant. *See United States v. Johnson*, 24 MJ 101, 106 (CMA 1987) (In prosecution for sabotage under 18 USC § 2155, "the accused's purpose and motive—anger, resentment, or whatever—are immaterial"); *United States v. Springer*, 51 F.3d 861, 868 (9th Cir.1995) ("desire to make a political statement or engage in protest activity" not a defense to failing to surrender for service of sentence); *United States v. Cullen*, 454 F.2d 386, 392 (7th Cir.1971) ("good motive does not tend to disprove ... consciousness of wrongdoing"); *United States v. Moylan*, 417 F.2d 1002, 1004 (4th Cir.1969) (motive not relevant to element of "willful intent" in destroying draft board records, "but is rather an element proper for the judge's consideration in sentencing"), *cert. denied*, 397 U.S. 910, 90 S.Ct. 908, 25 L.Ed.2d 91 (1970). *Cf. United States v. Vega*, 39 MJ 79, 81 (CMA 1994) ("motive to ensure safety ... *not inconsistent with*" guilty plea to sabotaging aircraft "with intent to injure, interfere with, or obstruct the national defense of the United States"). If she chose to quit her unit in protest, her reasons for quitting would tend to prove rather than disprove the requisite intent.

■ 43. To the extent that CPT Huet–Vaughn quit her unit because of moral or ethical reservations, her beliefs were irrelevant because they did not constitute a defense. *See* para. 14c(2)(a)(iii), Part IV, Manual, *supra* ("dictates of a person's conscience, religion, or personal philosophy cannot justify or excuse the disobedience of an otherwise lawful order"); *United States v. Moylan*, 417 F.2d at 1008 ("[T]he exercise of a moral judgment based upon individual standards does not carry with it legal justification or immunity from punishment for breach of the law.").

■ 44. To the extent that CPT Huet–Vaughn quit her unit because she felt it was necessary to avoid a greater evil, the proffered evidence was irrelevant because it did not support a "necessity" defense. When "justification" or "necessity" are asserted as defenses, the evidence must tend to show that the accused had no alternative but to break the law. The defense is not available where the accused's purpose is to cause a change in government policy. *United States v. Schoon*, 971 F.2d 193, 198 (9th Cir.), *cert. denied*, 504 U.S. 990, 112 S.Ct. 2980, 119 L.Ed.2d 598 (1992); *United States v. Kroncke*, 459 F.2d 697, 701 (8th Cir.1972). Accordingly, we hold that the military judge did not abuse his discretion by excluding as irrelevant evidence of future or potential war crimes. *See United States v. Romano*, 849 F.2d 812, 814 n. 3–815 (3d Cir.1988) (upholding district court's exclusion of evidence of "alleged crimes which were or are being committed by the United States military and/or other federal officials," "international law," "divine law or other religious teachings," in prosecution for damaging military aircraft); *United States v. Seward*, 687 F.2d 1270, 1273 (10th Cir.1982) (upholding district court's exclusion of evidence of "morality or immorality of nuclear weapons or nuclear power," "motive" of defendants, "wisdom" of government policy, or religious beliefs offered as a defense to trespassing at a nuclear plant site), *cert. denied*, 459 U.S. 1147, 103 S.Ct. 789, 74 L.Ed.2d 995 (1983).

■ 45. To the extent that CPT Huet–Vaughn's acts were a refusal to obey an order that she perceived to be unlawful, the proffered evidence was irrelevant. The so-called "Nuremberg defense" applies only to individual acts committed in wartime; it does not apply to the Government's decision to wage war. *See United States v. Berrigan*, 283 F.Supp. 336, 341 (D.Md.1968), *aff'd sub nom. United States v. Eberhardt*, 417 F.2d 1009 (4th Cir.1969), *cert. denied*, 397 U.S. 909, 90 S.Ct. 907, 25 L.Ed.2d 90 (1970). The duty to disobey an unlawful order applies only to "a positive act that constitutes a crime" that is "so manifestly beyond the legal power or discretion of the commander as to admit of no rational doubt of their unlawful-

ness." *United States v. Calley*, 22 USCMA 534, 543, 48 CMR 19, 28 (1973), *citing Lambert v. California*, 355 U.S. 225, 228, 78 S.Ct. 240, 242–43, 2 L.Ed.2d 228 (1957), and W. Winthrop, *Military Law and Precedents* 296–97 (2d ed. 1920 Reprint). CPT Huet–Vaughn tendered no evidence that she was individually ordered to commit a "positive act" that would be a war crime.

46. Finally, to the extent that CPT Huet–Vaughn intended to contest the legality of the decision to employ military forces in the Persian Gulf, the evidence was irrelevant, because it pertained to a non-justiciable political question. *See Flast v. Cohen*, 392 U.S. 83, 95, 88 S.Ct. 1942, 1950, 20 L.Ed.2d 947 (1968) ("political question" not justiciable by federal courts); *Ange v. Bush*, 752 F.Supp. 509, 518 n. 8 (D.C.1990) ("[T]he decision as to whether to deploy United States troops is not a judicial function.").

47. We turn finally to the military judge's instruction that quitting one's unit "because of one's conscience, religion, personal philosophies, ethical or professional considerations, is not a defense." Although the military judge permitted CPT Huet–Vaughn to testify about her moral and ethical objections to the war, his instruction undercut any defense based on those objections. In effect, the members were told to disregard such evidence when they deliberated on findings. This instruction had the same effect as excluding the evidence, but it was a correct statement of the law. *See United States v. Berrigan, supra; accord United States v. Perl*, 584 F.2d 1316, 1322 (4th Cir. 1978), *cert. denied*, 439 U.S. 1130, 99 S.Ct. 1050, 59 L.Ed.2d 92 (1979); *United States v. Dougherty*, 473 F.2d 1113, 1138 (D.C.Cir. 1972).

48. Appellate defense counsel cite several military cases that warrant comment. In *United States v. Shull*, 1 USCMA 177, 2 CMR 83 (1952), this Court found insufficient evidence of intent to shirk important service. In our view, *Shull* undercuts CPT Huet–Vaughn's argument, because this Court there held:

It is enough, we hold, that in a case of this nature a court-martial determine on the basis of substantial evidence that the duty was imminent, and that as a consequence of his unauthorized absence the accused in fact avoided it or had reasonable cause to know that he would do so....

1 USCMA at 182–83, 2 CMR at 88–89. This Court then concluded that the evidence was insufficient to establish that the accused knew that he would miss his overseas deployment by overstaying his pass. *Id.*

49. In *United States v. Cline*, 2 USCMA 411, 9 CMR 41 (1953), this Court held that the accused's testimony was sufficient to raise an issue regarding his intent to desert. The accused had testified that his lieutenant told him "to leave, to go back to the front or back to regiment or to go otherwise." The accused testified that later in the conversation the lieutenant told him "to get to regiment or to Pusan [, Korea] or someplace in that location." 2 USCMA at 412, 9 CMR at 42. The accused went to his regimental headquarters and then to Pusan, where he was apprehended. Our Court held that the accused's testimony "raised the issue of whether he had ever formed an intention to desert." 2 USCMA at 413, 9 CMR at 43. Unlike Private Cline's order from his lieutenant, CPT Huet–Vaughn's deployment orders were not ambiguous or conflicting. She testified unequivocally that she understood her deployment orders, but she had decided that she could not in good conscience support the deployment to the Persian Gulf.

50. In *United States v. McIntyre*, 2 USCMA 559, 10 CMR 57 (1953), this Court affirmed a conviction of desertion with intent to avoid hazardous duty. The accused had "left his unit shortly before it was scheduled to make an attack." 2 USCMA at 560, 10 CMR at 58. His only contention at trial was "that Army food made him sick and he left the forward area for that reason." 2 USCMA at 561, 10 CMR at 59. This Court upheld the law officer (now military judge)'s refusal to instruct that it was a defense if the accused "in good faith felt he was unable to perform his duty." Our Court held that such a defense was not raised by the evidence. CPT Huet–Vaughn's excuse for leaving her

unit, like Private (PVT) McIntyre's, did not raise a defense.

51. In *United States v. Apple*, 2 USCMA 592, 10 CMR 90 (1953), our Court held that the law officer erred by failing to submit the issue of intent to the court members. In *Apple* the accused testified that he did not intend to avoid hazardous duty but that he left his unit, located on the main line of resistance, and went to the rear "to see what had occasioned the evident confusion in his records with respect to rotation points." 2 USCMA at 593, 10 CMR at 91. PVT Apple, like CPT Huet–Vaughn, testified that he did not intend to avoid hazardous duty. Unlike CPT Huet–Vaughn's testimony, however, PVT Apple's testimony suggested that he believed he had discharged his duty to serve in the combat zone and was eligible for rotation out of the combat zone. Unlike CPT Huet–Vaughn, PVT Apple did not testify that he would refuse to support the war effort whether his rotation points were correctly computed and entered in his records. Unlike PVT Apple's case, CPT Huet–Vaughn's intent was submitted to the trier of fact with appropriate instructions.

52. In *United States v. Williams*, 10 CMR 219 (ABR 1953), the accused was charged with deserting his unit with intent to remain away permanently. The board of review (now Court of Criminal Appeals) held that the law officer erred by refusing to admit evidence supporting the accused's testimony that he absented himself to complete work on an invention and that he always intended to return to the Army after completing his invention. 10 CMR at 220. This case is distinguishable from CPT Huet–Vaughn's case because the intent at issue is different. The evidence proffered by PVT Williams supported his intent to remain away only temporarily and, as such, was relevant. The evidence proffered by CPT Huet–Vaughn did not negate her intent to avoid deploying to the Persian Gulf. To the contrary, it tended to prove that she intended to avoid deployment by showing that she was opposed to the war on moral and humanitarian grounds.

Based on the discussion above, we answer the certified question in the negative.

The decision of the United States Army Court of Military Review on reconsideration is set aside. The record of trial is returned to the Judge Advocate General of the Army for remand to the Court of Criminal Appeals for further review.

Judges COX, CRAWFORD, and WISS concur.

SULLIVAN, Chief Judge (dissenting in part and concurring in the result):

53. I disagree with the majority's rationale in this case. I would hold that it was error for the military judge to prevent Captain (CPT) Huet–Vaughn from explaining her state of mind at the time she left her unit. *United States v. Huff*, 7 USCMA 247, 250, 22 CMR 37, 40 (1956) ("[A]n accused cannot be denied every opportunity to present evidence at the trial to negate the existence of every element of the offense charged.").

54. Under our case law CPT Huet–Vaughn's mental processes were relevant to determine whether she had an intent to avoid hazardous duty or shirk important service as required by Article 85, Uniform Code of Military Justice, 10 USC § 885. *See United States v. Apple*, 2 USCMA 592, 10 CMR 90 (1953); *United States v. McIntyre*, 2 USCMA 559, 10 CMR 57 (1953); *United States v. Cline*, 2 USCMA 411, 9 CMR 41 (1953); *United States v. Shull*, 1 USCMA 177, 2 CMR 83 (1952) (evidence of different intents other than to avoid hazardous duty or shirk important service are relevant to disprove the required intent for desertion); *cf. United States v. Kabat*, 797 F.2d 580, 588–89 (8th Cir.1986) (in prosecution for sabotage under 18 USC § 2155 no error for trial judge not to specifically instruct on motive evidence which had been admitted during trial on merits to negate specific intent), *cert. denied*, 481 U.S. 1030, 107 S.Ct. 1958, 95 L.Ed.2d 530 (1987). The majority's attempt to distinguish these cases is not persuasive.

55. However, I agree with the majority that the record shows that CPT Huet–Vaughn was not prevented from explaining her reasons for leaving her unit to the mem-

bers. Accordingly, I find that the error committed by the military judge in granting the motion *in limine* was harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).