# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
SCHENCK, ZOLPER, and WALBURN
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Sergeant First Class ABDULLAH WEBSTER**
**United States Army, Appellant**

ARMY 20040588

Headquarters, 1st Infantry Division
Robin L. Hall, Military Judge
Colonel Michael R. Snipes, Staff Judge Advocate (trial)
Lieutenant Colonel Stuart W. Risch, Staff Judge Advocate (post-trial)

For Appellant:  James R. Klimaski, Esquire (argued); James R. Klimaski, Esquire; Lynn I. Miller, Esquire; and Captain Edward Bahdi, JA (on brief); James R. Klimaski, Esquire; and Captain Edward Bahdi, JA (on reply brief).

For Appellee: Captain Michael C. Friess, JA (argued); Captain Michael C. Friess, JA; Major Tami L. Dillahunt, JA; and Colonel John W. Miller II, JA (on brief).

30 January 2008

------------------------------------
OPINION OF THE COURT
------------------------------------

SCHENCK, Senior Judge:

A military judge sitting as a general court-martial convicted appellant, pursuant to his pleas, of missing movement by design and disobeying a superior commissioned officer (two specifications), in violation of Articles 87 and 90, Uniform Code of Military Justice, 10 U.S.C. §§ 887 and 890 [hereinafter UCMJ].[1] The military judge sentenced appellant to a bad-conduct discharge and fourteen months confinement.  The convening authority reduced the period of confinement to eleven months and otherwise approved the sentence.  This case is before the court for review pursuant to Article 66, UCMJ.

---

[1] The military judge granted the defense motion to merge the disobedience specifications for purposes of sentencing.

Appellant asserts three assignments of error; two warrant discussion, but no relief.  First, appellant contends he "did not freely plead guilty because the Islamic scholars he consulted prohibited him from serving in Iraq where he could kill fellow Muslims."  We find appellant's plea knowing, voluntary, and provident.  Second, appellant asserts the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb [hereinafter RFRA], "provides precedent for invalidating" his guilty plea.  We will review appellant's RFRA claim as an assertion that the Army infringed upon his First Amendment right to free exercise of religion by requiring him to deploy in support of Operation Iraqi Freedom.  Assuming arguendo the Army substantially burdened appellant's exercise of religion, we nevertheless uphold the government action because the Army acted in furtherance of a compelling government interest and used the least restrictive means in furthering that interest.  *See Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418, 423 (2006).

## FACTS

Appellant, a forty-year-old combat engineer, enlisted in the Army in 1985.  Between 1990 and 1991, appellant deployed to the Middle East in support of Operations Desert Storm and Desert Shield.  Appellant converted to Islam in 1994 and, after his religious conversion, deployed with his Army unit to Bosnia in 1999 and Kosovo in 2002.  In June 2004, appellant pleaded guilty and was found guilty of missing movement (by design) to Iraq on 8 February 2004 for Operation Iraqi Freedom, willfully disobeying an order from Captain (CPT) RH "to pack and deliver his B-Bag by 14 January 2004," and willfully disobeying an order from Major (MAJ) DK "to prepare and load his [r]ucksack, A-Bag and B-Bag by 4 February 2004 . . . ."

*2003 Deployment*

In March 2003, appellant was informed his unit would probably deploy for Operation Iraqi Freedom.  Although appellant had doubts whether he should participate in a war against Muslims due to his religious belief, he did not initially submit a conscientious objector packet.  Instead, appellant sought religious guidance from Sheiks and Islamic scholars on the internet.

Appellant submitted a conscientious objector packet in August 2003, but withdrew it on 25 September 2003 after discussing it with his battalion commander.  On or about 14 January 2004, CPT RH, appellant's company commander, told appellant that he would be deploying to Iraq and ordered appellant to pack and deliver his "B bag."  Appellant failed to do so.  On or about 4 February 2004, MAJ DK, the rear detachment commander, ordered appellant to prepare and load his rucksack, "A-bag," and "B-bag."  Appellant did not comply with this order.  Appellant's unit deployed to Iraq on 8 February 2004.  Although appellant knew of

the deployment, he missed the movement and filed a new conscientious objector packet on the same day.

*Motion to Abate the Court-Martial Proceeding*

At appellant's court-martial and prior to denial of appellant's request for conscientious objector status, the defense moved to abate the court-martial proceeding until the request was processed. In support of his Motion to Hold Trial in Abeyance, filed with the trial court on 6 May 2004, appellant included questions other persons apparently posed to Islamic scholars on the internet and the responses they received. In response to a question about Islam's stance on self-defense, one Islamic scholar replied, "[p]rotecting oneself and one's honour, mind, wealth and religion is a well-established basic principle in Islam. . . . A person has to defend himself; it is not permissible for him to consume that which will harm him, and it is not permissible for him to allow anyone to harm him." Appellant also submitted other purported scholarly opinions in support of his position that Muslim soldiers were not permitted to participate in the war in Iraq.[2]

In December 2003, appellant sought guidance on the internet about accepting a non-combatant role, asking:

> I am a Muslim currently serving in the armed forces . . . .
> I had informed my superiors that I was not allowed to
> place myself in a situation where I would have to fight
> another Muslim. My employers have since arranged to
> place me in a job where I will be assisting with the
> rebuilding of essential amenities in Iraq such as restoring
> clean water and electricity. What is the ruling for a
> Muslim, to go to Iraq to assist with restoring services to
> local Muslims?

Sheikh Muhammad Al-Mukhtar Ash-Shanqiti, Director of the Islamic Center of South Plains, Lubbock, Texas, responded:

---

[2] The opinions, dated March 2003, were obtained from an unidentified internet website and were attributed to Sheikh Faysal Mawlawi, Deputy Chairman of the European Council for Fatwa and Research, "Dr. 'Ali Jum'ah, Professor of the Principles of Islamic Jurisprudence at Al-Azhar University," and "Sheikh 'Abdul-Majeed Subh, a prominent Al-Azhar scholar."

> First of all, you should know that Muslims who are
> American citizens share the responsibility of defending
> their country militarily.  The issue is not to fight a Muslim
> or not, but it is related to whether the war is legitimate or
> not.  If the war is just and you are fighting against an
> aggressor, then you are allowed to join this war, whether it
> is waged against Muslims or not.  But if the war is not
> legitimate, then you are not allowed to join it at any case,
> whether you are fighting against Muslims or non-Muslims.

During the motions hearing, appellant's defense counsel also elicited the testimony of CPT AA, a Muslim chaplain who interviewed appellant regarding his conscientious objector request.  Captain AA spoke to appellant about serving in Iraq as a non-combatant soldier and did not recall appellant stating that he refused to serve in any capacity.  Captain AA testified that there are three permissible reasons for a Muslim to kill another Muslim:  "[o]ne would be of an accident; two, would be stoning the adulterer; three, would be in regards to retribution of justice."  He averred the last category would allow Muslims to kill Muslims such as Osama Bin Laden who "has created mischief and havoc that has harmed the greater Muslim community."  Additionally, CPT AA testified that pursuant to retribution of justice, a Muslim could kill another Muslim in self-defense.  In fact, CPT AA stated Muslims "would *have to* defend themselves in self-defense."  (Emphasis added).  According to CPT AA, Islamic scholars do not forbid Muslims from deploying to Iraq altogether and have advised non-combatant soldiers "[i]f you do go; go, and it's better that you don't pick up a weapon."

*Guilty Plea Inquiry*

Appellant pleaded guilty to all charges and specifications.  During the providence inquiry, appellant told the military judge he intentionally missed the movement because:

> given the information that I received if I was to deploy it
> would be as if I was to denounce my faith and I said that I
> do not want to harm anybody or -- to me, I like to ensure I
> do the best job as possible, and to me . . . it's also
> spiritual and I did not want to wrestle with this
> downrange.

Appellant stated his decision was based upon his "limited" knowledge and his review of the Koran.  The following discussion ensued:

4

> MJ: And I understand and appreciate that struggle and I think it's a difficult one. . . . [I]n my review . . . of the documents you've provided the court it indicated to me that those soldiers who are faithful to the Islamic faith . . . may be able to deploy in support of Operation Iraqi Freedom, and may indeed have jobs that are not inconsistent with their beliefs. At any rate, my ruling was that, of course, that would not provide a defense to disobeying the orders. . . . [D]o you understand that that's not a defense?
>
> ACC: [Confers with counsel] Right. We spoke about it . . . for my action -- if you ask me am I guilty or not . . . but legally . . . for that I'm guilty.

During the providence inquiry, appellant admitted that he intentionally did not deliver his equipment (B-bag) on 14 January, intentionally did not prepare and load his rucksack, A-bag, and B-bag on 4 February, and intentionally missed movement on 8 February. Appellant agreed he was legally guilty and did not have a defense to disobeying the orders. In addition, the military judge explained the affirmative defense of duress under Rule for Courts-Martial [hereinafter R.C.M.] 916(h). *See also* Dep't of Army, Pam. 27-9, Legal Services: Military Judges' Benchbook, para. 5-5 (15 Sept. 2002). Appellant agreed this defense did not apply to his case.

After appellant's unsworn statement during presentencing, the military judge reopened the providence inquiry and again discussed the defense of duress with appellant. The military judge then stated:

> MJ: I want to go back to this issue of duress and whether or not you felt so psychologically overpowered that you were going to immediately suffer death or grievous bodily harm if you didn't disobey these orders and miss movement. So, let me read you the full definition and then I want you to tell me in your own words why you think that doesn't fit, okay?

The military judge then re-stated the requirement for the affirmative defense of duress under R.C.M. 916(h). The following colloquy then ensued:

> MJ: Do you want a moment to talk to [your defense counsel]?
>
> ACC: Yes, Your Honor.

5

MJ:  Go ahead.

[Accused and counsel confer]

ACC:  With my understanding, Your Honor, is the -- as if I was not threatened to not put my bags on the vehicle. That's----

MJ:  So, in fact nothing was going to happen to you if you didn't put your bags on there, right?

ACC:  At that moment, I didn't, ma'am, -- Your Honor, no.

MJ:  And same thing with the missing movement?

ACC:  Missing movement----

MJ:  Which was the 8th of February.

ACC:  Same answer.

MJ:  Okay.  So, I think what I hear you saying is that the reference to the death sentence that [the] chaplain made was sort of similar to what you and I talked about earlier which was a whole series of events would have to happen before you would be in any danger, correct?

ACC:  To -- okay, here is how I understand it.  No one has had threatened me not to load the bags.  With the understanding of a death sentence is if I was to deploy downrange I cannot engage in combat even if I am killed. That's----

MJ:  So, and that is sort of what Chaplain [AA] was saying at the end, is that what you are saying?

ACC:  Yes, Your Honor.

MJ:  Well, like the chaplain, I have no idea whether that is the equivalent of committing suicide or not.  But, it is

certainly not the equivalent of something immediately
happening to you, is there -- is it?

ACC: No, Your Honor.

MJ: So, I mean the problem I have with the defense of
duress is if you were to raise the defense of duress, if you
had [pleaded] not guilty for example, all right, the law
requires that the danger has to be immediate.

ACC: Right.

MJ: And in this case I just don't see an immediate danger,
do you?

ACC: Negative, Your Honor.

Before accepting appellant's plea, the military judge asked appellant, "Do you understand that even though you understand that you are guilty you have the legal and moral right to plead not guilty and to place upon the government the burden of proving your guilt beyond a reasonable doubt?" Appellant responded, "Yes, Your Honor." The military judge told appellant, "Take one last moment to consult with [your defense counsel] and if you still want to plead guilty we'll drive on." Appellant, after conferring with counsel, stated, "I'm ready, Your Honor."

*Presentencing Evidence*[3]

During presentencing, appellant did not discuss his religious research and did not explain why he chose certain guidance. In his 7 May 2004 conscientious objector statement, admitted at trial as extenuating and mitigating evidence, appellant averred:

Based upon the advice given to me by Islamic Scholars
. . . the conclusions were:

1. Consensus was that this [sic] no Muslims are permitted

---

[3] In asserting protection under the RFRA, appellate defense counsel draw our attention to appellant's presentencing evidence consisting of documents and the testimony of appellant's brigade commander, Colonel (COL) WH. We will consider this evidence in assessing the burden on appellant's free exercise of religion.

7

> to participate in this conflict.
>
> 2. Muslims are not allowed to kill another Muslim except under three conditions . . . . Given the religious ruling, any combatant role I undertake would jeopardize my belief and place me in an unfavorable position on the Day of Judgment.

Appellant further explained in this statement: "[m]y beliefs became [sic] incompatible with military service when I was ordered to deploy to Iraq and become a combatant soldier who would possibly have to take up arms against other Muslims." Although appellant noted he had inquired whether he could be assigned a non-combatant role, appellant did not discuss COL WH's offer to work directly with the "Iraqi ministries of transportation, oil, power and public works."

During presentencing, COL WH testified he explored the possibility of appellant administratively separating from the military, but because the Army had undergone a "stop-loss" policy, resignation was not an option. Colonel WH told the court other Muslim soldiers had deployed with his brigade and served as interpreters. Additionally, the brigade served as an interface for reconstruction efforts and was aligned with the Iraqi Civil Defense Corps, a unit that includes Iraqi Muslim soldiers, whose sole purpose is to "kill or capture enemy fighters who are threatening the future of Iraq." Colonel WH offered appellant a non-combatant role with the brigade staff as a noncommissioned officer assistant who would work with Iraqi oil ministers on construction projects. Appellant was initially excited about this opportunity and COL WH declassified a briefing concerning the "mission of the engineer brigade" and encouraged appellant to share the documents with the Islamic scholars. Colonel WH testified appellant was a good noncommissioned officer, but encountered problems when he "started drawing lines about whether he wanted to serve or not . . . when [the] United States started doing missions in countries that had Islamic people in it and that's when [appellant] stopped his desire to serve, despite his oath to the Constitution, [and] to the orders of the superiors over him."

## PROVIDENCE OF THE PLEA

*Law*

We review a military judge's acceptance of a guilty plea for abuse of discretion. *United States v. Abbey*, 63 M.J. 631, 632 (Army Ct. Crim. App. 2006) (citing *United States v. Eberle*, 44 M.J. 374, 375 (C.A.A.F. 1996)). Unless a substantial basis in law and fact for questioning a guilty plea is revealed in our review of the record of trial, we will not overturn a military judge's acceptance of a

guilty plea. *United States v. Adams*, 63 M.J. 223, 226 (C.A.A.F. 2006) (citing *United States v. Prater*, 32 M.J. 433, 436 (C.M.A. 1991)).

If the accused sets up a matter inconsistent with his plea at anytime during the court-martial proceeding, the military judge must either resolve the apparent inconsistency by reopening the providence inquiry "or reject the plea." *United States v. Shaw*, 64 M.J. 460, 462 (C.A.A.F. 2007) (citing *United States v. Garcia*, 44 M.J. 496, 498 (C.A.A.F. 1996) (citing Article 45(a), UCMJ, and R.C.M. 910(h)(2))). Additionally, when an inconsistent matter "reasonably raise[s] the question of a defense . . . it [is] incumbent upon the military judge to make a more searching inquiry to determine the accused's position on the apparent inconsistency with his plea of guilty." *United States v. Estes*, 62 M.J. 544, 548 (Army Ct. Crim. App. 2005) (quoting *United States v. Timmins,* 21 U.S.C.M.A. 475, 479, 45 C.M.R. 249, 253 (1972)). However, "a mere possibility of a conflict [or an inconsistency] is not a sufficient basis to overturn the trial results." *United States v. Phillippe*, 63 M.J. 307, 309 (C.A.A.F. 2006) (internal quotations marks and citations omitted).

In determining whether "the providence inquiry provides facts inconsistent with the guilty plea, we take the accused's version of the facts 'at face value.'" *United States v. Gilchrist*, 61 M.J. 785, 791 (Army Ct. Crim. App. 2005) (quoting *United States v. Jemmings*, 1 M.J. 414, 418 (C.M.A. 1976)); *accord United States v. Pajeaud*, 63 M.J. 644, 645 (C.G. Ct. Crim. App. 2006) ("The accused's . . . statements are taken at face value; their credibility is not part of the analysis.").

*Elements of the Offenses*

Article 87, UCMJ, provides the elements of missing movement are that the accused: (1) "was required in the course of duty to move with a ship, aircraft or unit;" (2) "knew of the prospective movement of the ship, aircraft or unit;" (3) "missed the movement of the ship, aircraft or unit;" and (4) "missed the movement through design or neglect." *Manual for Courts-Martial, United States* (2002 ed.) [hereinafter *MCM*], Part IV, para. 11b. "Design" is further defined as "on purpose, intentionally, or according to plan and requires specific intent to miss the movement." *Id*. at Part IV, para. 11c(3).

In criminal law, intent and motive are not the same.

> A person often acts with two or more intentions. These
> intentions may consist of an immediate intention (intent)
> and an ulterior one (motive), as where the actor takes
> another's money intending to steal it and intending then to
> use it to buy food for his needy family . . . . It may be
> said that, so long as the defendant has the intention

9

> required by the definition of the crime, it is immaterial
> that he may also have had some other intention.

*United States v. Huet-Vaughn*, 43 M.J. 105, 113-14 (C.M.A. 1995) (quoting W. LaFave and A. Scott, 1 *Substantive Criminal Law* § 3.5(d) at 313 (1986) (footnote omitted)). Once intent has been proven, "it is immaterial that a defendant may also have had some secondary, or even overriding, intent. If the intent is overriding -- that is, it reflects the ultimate end sought which compelled the defendant to act -- it is more properly labeled a 'motive.'" *United States v. Kabat*, 797 F.2d 580, 587 (8th Cir. 1986) (internal citations omitted), *cert. denied*, 481 U.S. 1030 (1987).

Article 90, UCMJ, disobeying a superior commissioned officer requires: "(a) That the accused received a lawful command from a certain commissioned officer; (b) That this officer was the superior commissioned officer of the accused; (c) That the accused then knew that this officer was the accused's superior commissioned officer; and (d) That the accused willfully disobeyed the lawful command." *MCM*, Part IV, para. 14b(2). Article 90, UCMJ, further provides: "[t]he order may not, without [] a valid military purpose, interfere with private rights or personal affairs. However, the dictates of a person's conscience, religion, or personal philosophy cannot justify or excuse the disobedience of an otherwise lawful order." *Id.* at para. 14c(2)(a)(iii).

*Duress Defense*

Rule for Courts-Martial 916(h) explains the duress defense as:

> a defense to any offense except killing an innocent person
> that the accused's participation in the offense was caused
> by a reasonable apprehension that the accused or another
> innocent person would be immediately killed or would
> immediately suffer serious bodily injury if the accused did
> not commit the act. *The apprehension must reasonably
> continue throughout the commission of the act.* If the
> accused has any reasonable opportunity to avoid
> committing the act without subjecting the accused or
> another innocent person to the harm threatened, this
> defense shall not apply.

(Emphasis added). *See also United States v. Washington*, 57 M.J. 394, 397 (C.A.A.F. 2002) (discussing the duress defense under the UCMJ and R.C.M. 916(h)); *United States v. Roby*, 23 U.S.C.M.A. 295, 49 C.M.R. 544 (1975) (setting aside a plea of guilty to absence without leave because defense of duress was reasonably raised during providence inquiry).

*Conscientious Objector Status*

Army Reg. 600-43, Conscientious Objection [hereinafter AR 600-43] (15 May 1998) "sets forth policy, criteria, responsibilities, and procedures to classify and dispose of military personnel who claim conscientious objection to participation in war in any form or to the bearing of arms." *Id.* at para. 1-1. This regulation indicates in pertinent part, however, that "requests by personnel for qualification as a conscientious objector after entering military service will not be favorably considered when [the] request [is] . . . [b]ased on objection to a certain war." *Id.* at para. 1-7a(4).

Unlike duress, conscientious objection is generally not a defense to the offenses of failure to obey lawful orders or missing movement. Our superior court many years ago reaffirmed that "conflict with religious scruples . . . [is] 'insufficient as a defence' to a charge of disobedience." *United States v. Wilson*, 19 U.S.C.M.A. 100, 101, 41 C.M.R. 100, 101 (C.M.A. 1969) (quoting William Winthrop, *Military Law and Precedents* 576-77 (2d ed. 1920)). In that case, Private (PVT) Wilson absented himself without leave after his application for discharge from the Army as a conscientious objector was denied. In affirming PVT Wilson's conviction, the court stated:

> Recently, we reviewed the dilemma of a person in the military service who develops convictions of conscience that conflict with his military duties. His position is like that of the civilian whose religion or conscience is in conflict with lawful orders of the Government. Speaking of the latter, the Supreme Court of the United States has said that to allow scruples of personal conscience to override the lawful command of constituted authority would in effect . . . permit every citizen to become a law unto himself. . . . [T]he freedom to think and believe does not excuse intentional conduct that violates a lawful command. It may be that [appellant's commander] should have sought to persuade before resorting to the tremendously powerful force of a direct command, but we are not concerned with the wisdom of his action. If the command was lawful, the dictates of the accused's conscience, religion, or personal philosophy could not justify or excuse disobedience.

*Wilson*, 19 U.S.C.M.A. at 100-01, 41 C.M.R. at 100-01 (internal citations and quotations omitted).

In *United States v. Stewart*, our superior court further declared:

> [C]laimed conscientious objection or a Secretary's denial of a discharge application by a conscientious objector is a defense to a court-martial proceeding only if the Constitution, a statute, or a regulation so provides. In this instance there is no [C]onstitutional right to refuse military orders because of conscientious objection; no statutory provision makes conscientious objection or a Secretary's improper denial of a conscientious objector's discharge application a defense in a military trial and the regulation permitting submission of discharge applications by in-service conscientious objectors contains no authority for the litigation of this issue at a court-martial.

20 U.S.C.M.A. 272, 276, 43 C.M.R. 112, 116 (C.M.A. 1971).

Relying on this statement of the law, the court, in *United States v. Lennox*, held that even erroneous action on a conscientious objector application would not "operate to end the obligation of a member of the armed forces to obey orders that are otherwise lawful." 21 U.S.C.M.A. 314, 319, 45 C.M.R. 88, 93 (1972). More recently, our superior court cited *Lennox* for the proposition that "where the conscientious objector regulation creates no right to refuse military duties, its violation creates no defense to missing movement or disobedience of orders." *United States v. Walker*, 41 M.J. 462, 468 (C.A.A.F. 1995).

## *Analysis*[4]

Appellate defense counsel now assert the military judge erred in accepting appellant's plea because he "did not freely plead guilty" and appellant's "guilty plea was irregular and not freely given because the Islamic scholars . . . forbade

---

[4] We limit the scope of our review of appellant's unconditional guilty plea to the guilty plea inquiry and any presentencing evidence appellant may present which is inconsistent with his plea. *See United States v. Harding,* 61 M.J. 526, 529-30 (Army Ct. Crim. App. 2005) (holding the government cannot use sentencing testimony to support the providence of a guilty plea); R.C.M. 910(h)(2) (stating if an accused presents sentencing evidence which is inconsistent with the plea, the military judge must reopen the providence inquiry and resolve the inconsistency).

[appellant] from deploying to Iraq [and] doing so would condemn [appellant] to hell."

Appellant does not now contend the military judge erred by failing to discuss potential defenses such as duress; nor does appellant assert the orders he received were unlawful[5] or that his conscientious objector request was improperly denied. We do not find that appellant "set[] up [any] matter raising a possible defense" and we note that if any defense was raised, the military judge's inquiry appropriately "resolve[d] any apparent ambiguity or inconsistency." *Phillippe*, 63 M.J. at 310. The military judge informed appellant of the defense of duress and confirmed appellant did not miss movement and violate the lawful orders because he feared immediate death or serious bodily injury.

Additionally, appellant "has cited us to no [C]onstitutional or statutory provision that makes conscientious objection, a pending application for that status, or . . . violation of the procedures for considering that status, a defense to a court-martial for missing movement or disobeying otherwise lawful orders . . . ." *United States v. Johnson*, 45 M.J. 90, 92 (C.A.A.F. 1996). "[S]imilarly, we see no authority for a self-help remedy of disobedience." *Id*. Furthermore, AR 600-43, para. 1-7a(4) provides, conscientious objector requests made by personnel "after entering military service will not be favorably considered when [they] are . . . [b]ased on objection to a certain war." Appellant's "asserted religious beliefs, on the other hand, only forbad him from killing other Muslims, not from war in general." *Walker*, 41 M.J. at 471 n.* (Cox, J., concurring).

---

[5] Appellant has not asserted and we do not find that his orders to deploy were "given for an illegal purpose." *See generally United States v. Womack*, 29 M.J. 88 (A.C.M.R. 1989) (a "safe-sex" order was not illegal because its purpose was to safeguard the overall health of service members to ensure military readiness). Additionally, we would find a more general challenge to the legality of the war in Iraq also to be without merit. Courts have consistently declined to rule on the Constitutionality of the President's decision to deploy the Armed Forces as a "nonjusticiable political question" where "judicial intervention is deemed inappropriate." *United States v. New*, 55 M.J. 95, 108 (C.A.A.F. 2001). Furthermore, a "personal belief that an order is unlawful cannot be a defense to a disobedience charge." *Id*. at 109 (citing *Huet-Vaughn*, 43 M.J. at 114 (holding "the duty to disobey an unlawful order applies only to a positive act that constitutes a crime that is so manifestly beyond the legal power or discretion of the commander as to admit of no rational doubt of their unlawfulness." (internal quotation marks and citation omitted)).

Although appellant does not assert defenses were raised and unresolved, he does contend his plea was involuntary and the plea inquiry discussion between appellant and the military judge "evidences a lack of intent." We disagree. As our court previously noted:

> In no other segment of our society is it more important to have a single enforceable set of standards. . . . [Appellant's] decision was based on his own set of values and priorities. . . . If conscious regard was given by the appellant to the impact his choice would have on readiness or his fellow soldiers, it is not reflected in the record. To now authorize an after-the-fact judicial review on the merits of those personal values has no place in the military justice system.

*United States v. Banks*, 37 M.J. 700, 702 (A.C.M.R. 1993) (noting that such matters "would certainly be appropriate in extenuation and mitigation on sentencing").

At trial, appellant pleaded guilty to missing movement by design, which requires "specific intent to miss the movement." *MCM,* Part IV, para. 11c(3). Appellant admitted he intentionally failed to move with his unit on 8 February 2004 in support of Operation Iraqi Freedom. Additionally, appellant pleaded guilty to willfully failing to obey a lawful order, another specific intent offense. *MCM,* Part IV, para. 20c(2)(e). Appellant admitted he intentionally failed to deliver his equipment (B-bag) on 14 January 2004 and intentionally failed to prepare and load his rucksack, A-bag and B-bag on 4 February 2004, willfully violating both orders.

It is irrelevant that appellant missed movement or failed to obey the orders of his superior commissioned officers based on religious motives. *See Huet-Vaughn*, 43 M.J. at 114; *United States v. Johnson*, 24 M.J. 101, 106 (C.M.A. 1987) ("the accused's purpose and motive—anger, resentment, or whatever—are immaterial"); *United States v. Moylan*, 417 F.2d 1002, 1004 (4th Cir. 1969) (motive not relevant to "willful intent . . . but . . . an element proper for the judge's consideration in sentencing"), *cert. denied*, 397 U.S. 910 (1970). Whether appellant missed movement "because of moral or ethical *reservations*, [his] beliefs" are also immaterial "because they did not constitute a defense." *Huet-Vaughn*, 43 M.J. at 114 (emphasis added). *See MCM*, Part IV, para. 14c(2)(a)(iii); *Moylan,* 417 F.2d at 1008 ("[E]xercise of a moral judgment based upon individual standards does not carry with it legal justification or immunity from punishment for breach of the law."). We see no reason why the same logic would not apply to religious reservations—especially in the present case, where no defense of duress exists and the evidence sufficiently established intent. Appellant does not argue why a religious motive should be treated differently from other motives. Moreover, to the

extent that appellant missed movement because he felt "it was necessary to avoid a greater evil, [such] evidence was irrelevant [and] did not support a [duress] defense" because such a defense required that the accused "had no alternative but to break the law." *Huet-Vaughn*, 43 M.J. at 114 (finding appellant's motive to avoid a "greater evil" was irrelevant absent a valid necessity or justification defense). Accordingly, we hold that appellant made a knowing, voluntary, and provident plea of guilty.

## FREEDOM OF RELIGION

*Law*

Appellant also raises his right to freely exercise his religion under the RFRA as a basis for our court to overturn his guilty plea. Rather than determine whether appellant's unconditional guilty plea waived any statutory protection under the RFRA, we will consider appellant's argument as a claim his First Amendment rights were violated.[6] The Free Exercise Clause of the First Amendment to the Constitution indicates the government cannot "prohibit[] the free exercise" of religion. Historically, the Supreme Court drew a distinction between religiously motivated conduct—which may be restricted based on a legitimate secular concern even if a citizen's free exercise is affected—and religious belief. *See Reynolds v. United States*, 98 U.S. 145 (1879) (upholding statute prohibiting bigamy where law interfered with religious practices, not religious beliefs and opinions); *West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943) (holding government cannot control beliefs and stating, "If there is any fixed star in our [C]onstitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion or other matters of opinion or force citizens to confess by word or act their faith therein.").

---

[6] Under the facts of this case, we will review appellant's Constitutional challenge to his convictions de novo. *See United States v. Bart*, 61 M.J. 578, 581 (N.M. Ct. Crim. App. 2005) (allowing appellant to raise a Constitutional challenge to a sodomy conviction for the first time on appeal); *United States v. Sollmann*, 59 M.J. 831, 834 (A.F. Ct. Crim. App. 2004) (citing *Menna v. New York*, 423 U.S. 61 (1975)) ("a guilty plea does not preclude a [C]onstitutional challenge to the underlying conviction"); *but see United States v. Heath*, 39 M.J. 1101, 1101 (C.G.C.M.R. 1994) (applying the principle of waiver for a Constitutional challenge to a guilty plea conviction raised for the first time on appeal); *United States v. Collins*, 41 M.J. 428, 430 (C.A.A.F. 1995) (applying waiver for a double jeopardy challenge to a guilty plea because the "existing record" was not sufficiently developed).

The Supreme Court subsequently developed a framework to analyze whether a government action justifiably infringed on a citizen's free exercise of religion. That standard framework, however, has fluctuated. In 1963, the Court determined a state had to have a "compelling state interest" and not merely "a relationship to some colorable state interest" before it could burden the free exercise of religion by requiring a Seventh-Day Adventist to work on the Sabbath day of her faith. *Sherbert v. Verner*, 374 U.S. 398, 406 (1963). Nearly a decade later in a challenge to a compulsory public school attendance law by Amish parents, the Supreme Court again rejected the notion that "religiously grounded conduct is always outside the protection of the Free Exercise Clause." *Wisconsin v. Yoder*, 406 U.S. 205, 219-20 (1972). In overturning the conviction, the Court determined "it was incumbent on the State to show with more particularity how its admittedly strong interest in compulsory education would be adversely affected by granting an exemption to the Amish." *Id.* at 236.

In *Thomas v. Review Bd. of the Indiana Employment Security Div.*, 450 U.S. 707, 718 (1981), the Supreme Court established that the "state may justify an inroad on religious liberty by showing that it is the least restrictive means of achieving some compelling state interest." Not long after, the Court rejected this "compelling state interest test," replacing it with a less stringent standard in *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872 (1990). Reaffirming their holding in *Reynolds*, the Court stated "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Id.* at 879 (internal citations omitted).

Congress specifically responded to the *Smith* holding in 1993 with the RFRA, by reestablishing the "compelling state interest test" set forth in *Verner* and *Yoder*.[7] In the RFRA, Congress found in part:

> [G]overnments should not substantially burden religious
> exercise without compelling justification; . . . the Supreme
> Court virtually eliminated the requirement that the
> government justify burdens on religious exercise imposed
> by laws neutral toward religion; and . . . the compelling
> interest test as set forth in prior Federal court rulings is a
> workable test for striking sensible balances between

---

[7] Although not specifically mentioned in the RFRA, the Supreme Court also set forth the compelling government interest test in its 1981 *Thomas* opinion. *See Thomas*, 450 U.S. at 718.

> religious liberty and competing prior governmental
> interests.

42 U.S.C. § 2000bb(a).

Congress intended "to restore the compelling interest test . . . and to guarantee its application in all cases where free exercise of religion is substantially burdened; and . . . to provide a claim or defense to persons whose religious exercise is substantially burdened by government." *Id.* With the RFRA, "Congress has determined that courts should strike sensible balances, pursuant to a compelling interest test that requires the Government to address the particular practice at issue." *Gonzales*, 546 U.S. at 439.

### *Deference to the Military*

The Supreme Court "has long recognized that the military is, by necessity, a specialized society separate from civilian society." *Parker v. Levy*, 417 U.S. 733, 743 (1974). By necessity, the military has "developed laws and traditions of its own during its long history. The differences between the military and civilian communities result from the fact that 'it is the primary business of armies and navies to fight or be ready to fight wars should the occasion arise.'" *Id.* (quoting *United States ex rel. Toth v. Quarles*, 350 U.S. 11, 17 (1955)).

Prior to Congress imposing the RFRA compelling government interest (strict scrutiny) standard, the Supreme Court had previously provided guidance regarding how courts should review a servicemember's claim that a military requirement burdened his right to freely exercise his religion. In *Goldman v. Weinberger*, 475 U.S. 503 (1986), the Court afforded deferential treatment of military necessity and upheld the military's religiously neutral uniform restriction which infringed free exercise rights, even though the Court was applying a strict scrutiny standard.[8] Captain (Capt.) Goldman, an Air Force rabbi serving as a clinical psychologist, wore his yarmulke indoors even though the Air Force regulation prohibited wearing headgear indoors. *Id.* at 505. After refusing an order to comply with the Air Force regulation and receiving a letter of reprimand, Capt. Goldman sued claiming the regulation infringed on his First Amendment free exercise of his religious rights. *Id.*

---

[8] Congress subsequently responded to the *Goldman* decision by prescribing that "a member of the armed forces may wear an item of religious apparel while wearing the uniform," unless "the wearing of the item would interfere with the performance [of] military duties [or] the item of apparel is not neat and conservative." Armed Forces Act, 10 U.S.C. § 774(a)-(b) (2003).

at 505-06.  The Supreme Court upheld the military restriction (i.e., the burden) imposed on religious freedom stating:

> Our review of military regulations challenged on First Amendment grounds is far more deferential than [C]onstitutional review of similar laws or regulations designed for civilian society.  The military need not encourage debate or tolerate protest to the extent that such tolerance is required of the civilian state by the First Amendment; to accomplish its mission the military must foster instinctive obedience, unity, commitment, and esprit de corps.  The essence of military service is the subordination of the desires and interests of the individual to the needs of the service. . . . [W]ithin the military community there is simply not the same [individual] autonomy as there is in the larger civilian community.  In the context of the present case, when evaluating whether military needs justify a particular restriction on religiously motivated conduct, courts must give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest.

*Id*. at 507 (internal citations and quotations omitted).  The *Goldman* decision instructs courts to apply judicial deference when strictly scrutinizing the military's burden on the free exercise of religion. *Id*.  Furthermore, "[judicial] deference . . . is at its apogee when legislative action under the congressional authority to raise and support armies and make rules and regulations for their governance is challenged." *Rostker v. Goldberg*, 453 U.S. 57, 70 (1981).

*Army Policy*

Army policy pertaining to accommodating soldiers' free exercise rights is described in Army Reg. 600-20, Army Command Policy [hereinafter AR 600-20], para. 5-6a (13 May 2002), which provides:

> The Army places a high value on the rights of its soldiers to observe tenets of their respective religious faiths.  The Army will approve requests for accommodation of religious practices unless accommodation will have an adverse impact on unit readiness, individual readiness, unit cohesion, morale, discipline, safety, and/or health.  As used in this regulation, these factors will be referred to individually and collectively as "military necessity" unless

> otherwise stated. Accommodation of a Soldier's religious practices must be examined against military necessity and cannot be guaranteed at all times.

Army unit commanders have the responsibility to evaluate and approve or disapprove requests from soldiers for accommodation of religious practices. *Id.* at para. 5-6f.

The Army divides requests for religious accommodation into five categories: worship practices, dietary practices, medical practices, wear and appearance of the uniform, and personal grooming. *Id.* at para. 5-6g. The regulation further provides specific guidance for commanders to follow in processing requests for religious accommodation. *Id.*

*Analysis*

Appellant asserts "[t]he irreconcilable choice that the Army forced upon [him] constituted the prohibited 'substantial burden' upon his free exercise of religion. The Army therefore cannot justify its criminal prosecution of [him] under the compelling interest test of the [RFRA]." The government argues the Army did not substantially burden appellant's free exercise of his religion because he "could have deployed to Iraq in a non-combatant role, but he [chose] not to accept this offer" and "any miniscule burden on appellant's exercise of religion was in the furtherance of the national defense, a compelling governmental interest." Applying the higher compelling government interest test to analyze appellant's First Amendment claim rather than the Supreme Court's less stringent "valid and neutral law of general applicability," we generally agree with the government. *Smith*, 494 U.S. at 880.

The Army required appellant, a devout Muslim, to deploy with his unit in support of Operation Iraqi Freedom. The Army has set forth procedures for addressing the free exercise of religion in such cases. Soldiers attempting to avoid such a deployment may request conscientious objector status. Army policy also supports "requests for accommodation of religious practices unless accommodation will have an adverse impact on unit readiness, individual readiness, unit cohesion, morale, discipline, safety, and/or health," and the aforementioned factors are collectively referred to as those of "military necessity." AR 600-20, para. 5-6. In appellant's case, the command also attempted to give appellant the opportunity to deploy in a non-combatant position. The parties, however, disagreed as to whether such a position would satisfy appellant's religious requirements.

Nevertheless, we need not decide whether such requirements posed a substantial burden on appellant's free exercise of religion. We do not conclude, therefore, the government substantially burdened appellant's right to exercise his

19

freedom of religion. Assuming arguendo the government did so, however, we find the Army action furthered a compelling government interest using the least restrictive means. Moreover, while strictly scrutinizing the Army's burden on free exercise of religion, we apply judicial deference to "the professional judgment of military authorities concerning the relative importance of a particular military interest." *Goldman*, 475 U.S. at 507.

The Army has a compelling interest in requiring soldiers to deploy with their units. As the Supreme Court has said, "[i]t is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981) (quoting *Aptheker v. Secretary of State*, 378 U.S. 500, 509 (1964)). The Army's primary mission is to maintain national security by fighting and winning our nation's wars. *See* Dep't of Army, Field Manual 1, ch. 1 (14 June 2001). The Army cannot accomplish this primary mission if it cannot deploy, in a state of military readiness, the various units into which it is organized. Giving soldiers the option to decide selectively whether they wish to participate in particular military operations would undermine the readiness of all units to deploy, and thus compromise the Army's mission and national security. *See Wickham v. Hall*, 12 M.J. 145, 151 (C.M.A.1981) (reasoning that absent soldiers necessarily "diminish the unit's readiness and capability to perform its mission"). For this very reason, the UCMJ provides for substantial punishments for offenses, such as desertion, unauthorized absence, and missing movement, that undermine unit readiness. *MCM*, Part IV, paras. 9(e), 10(e), and 11(e); *see generally MCM*, Analysis of the Punitive Articles, app. 23 at A23-4 (explaining that "[t]he major reliance of the armed forces on rapid deployment and expeditious movement of personnel and equipment to deter or prevent the escalation of hostilities dictates that these offenses be viewed more seriously").

In this case, the Army furthered its compelling interest in the least restrictive manner possible. Although the Army required appellant to deploy with his unit, the Army made numerous allowances for him. The Army afforded him the opportunity to request relief as a conscientious objector. *See* AR 600-43. The Army gave him the right to request reasonable accommodation of his religious practices. *See* AR 600-20, para. 5-6. Finally, although apparently not required to do so by any regulation, appellant's commander generously allowed appellant to deploy with his unit in a non-combatant role. We conclude that the First Amendment does not require anything more, and appellant's rights have not been violated.[9]

---

[9] Our decision is consistent with the Supreme Court's decision in *Gonzales*, where the government failed to demonstrate a compelling interest in the uniform application of the Controlled Substance Act without an exception for a particular

(continued . . .)

As the Supreme Court has stated, "to accomplish its mission the military must foster instinctive obedience, unity, commitment, and esprit de corps." *Goldman*, 475 U.S. at 507. In *Parker v. Levy,* the Supreme Court elaborated on the unique requirements needed for an effective military:

> In *In re Grimley*, 137 U.S. 147, 153 (1890), the Court observed: "An army is not a deliberative body. It is the executive arm. Its law is that of obedience. No question can be left open as to the right to command in the officer, or the duty of obedience in the soldier." More recently we noted that "the military constitutes a specialized community governed by a separate discipline from that of the civilian," *Orloff v. Willoughby*, 345 U.S. 83, 94 (1953), and that "the rights of men in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty . . . ." *Burns v. Wilson*, 346 U.S. 137, 140 (1953) (plurality opinion). We have also recognized that a military officer holds a particular position of responsibility and command in the Armed Forces . . . .

---

(. . . continued)

drug which a church desired to use in religious services. 546 U.S. at 436-37. However, not all governmental programs must have religious exceptions. The Court noted in *Gonzales*, "We have no doubt that there may be instances in which a need for uniformity precludes the recognition of exceptions to generally applicable laws under RFRA." *Id*. at 436. "[T]he Government can demonstrate a compelling interest in uniform application of a particular program by offering evidence that granting the religious exemption would seriously compromise its ability to administer the program." *Id*. at 435. For the reasons set forth in our opinion, the government has demonstrated this compelling interest in having a uniform rule that soldiers deploy with their units. By way of contrast, we recognize that not all Army requirements are as compelling as insisting that soldiers deploy with their units. *See, e.g.*, *Hartman v. Stone*, 68 F.3d 973, 986 (6th Cir. 1995) (concluding the Army did not have a compelling interest in banning all religious practices in an on-post day care program).

417 U.S. at 743. "The inescapable demands of military discipline and obedience to orders cannot be taught on battlefields; the habit of immediate compliance with military procedures and orders must be virtually reflex with no time for debate or reflection." *Chappell v. Wallace*, 462 U.S. 296, 300 (1983).

## CONCLUSION

Appellant voluntarily enlisted in the Army and was obligated to deploy with his unit.

> His attempted self-emancipation from some, or all, of the obligations that he willingly incurred by virtue of that enlistment contract with the United States Government, prior to the termination thereof, may not now be excused upon the basis of subsequently acquired religious beliefs. His choice of religions remains inviolate. However his conduct involved in the exercise thereof "remains subject to regulation for the protection of Society."

*United States v. Cupp*, 24 C.M.R. 565, 572 (A.F.B.R. 1957) (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 304 (1940)).

> To the extent that a military man's freedom of conduct in practicing his religion is curtailed by the demand that he obey proper orders, that curtailment is a permissible result of the operation of a government under law. We hold that the accused had no legal right or privilege under the First Amendment to refuse obedience to the order[s], and that the order[s were] not given for an illegal purpose.

*United States v. Burry*, 36 C.M.R. 829, 831 (C.G.B.R. 1966) (affirming a finding of guilty to disobeying a lawful command where a ship's cook refused to cook on his religious Sabbath). *See* footnote 5, *supra*. Rather, those orders furthered a compelling interest by the least restrictive means.

The findings of guilty and sentence are affirmed.

Judge ZOLPER and Judge WALBURN concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court